### HARFORD NAT. BANK OF BEL AIR v. GARDNER.

(Supreme Court, Trial and Special Term, Otsego County.　March 20, 1916.)

1. APPEAL AND ERROR ☞930(1)—VERDICT—CONTROVERTED FACTS—PRESUMPTION.

On appeal from a verdict in favor of defendant, it must be assumed that the jury found all controverted questions in defendant's favor, and the facts as proved must therefore be considered in the light most unfavorable to the plaintiff.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3755, 3756, 3758; Dec. Dig. ☞930(1).]

2. BILLS AND NOTES ☞337(1)—INFIRMITY—"NOTICE" TO HOLDER.

Under Negotiable Instruments Law (Consol. Laws, c. 38) § 95, providing that, in order to constitute "notice" of an infirmity in the instrument, the person to whom it is negotiated must have had actual knowledge, or knowledge of such facts that his action in taking the instrument amounted to bad faith, something more than suspicion is necessary to invalidate the title of a holder in due course.

[Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. ☞337(1).

For other definitions, see Words and Phrases, First and Second Series, Notice.]

3. BILLS AND NOTES ☞525—INFIRMITY—NOTICE OF HOLDER—EVIDENCE.

In an action by plaintiff bank as indorsee of a note procured by the payee company through a fraudulent sale of its worthless stock to defendant, where plaintiff's president was officially connected with the company and familiar with its general methods of selling stock, evidence *held* sufficient to support the finding of the jury that such president, acting for the bank, had sufficient knowledge of the infirmity to render his action in taking the note bad faith, constituting notice of an infirmity in the instrument, as provided by Negotiable Instruments Law, § 95.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1832– 1839; Dec. Dig. ☞525.]

4. EVIDENCE ☞590—WEIGHT—INTERESTED WITNESS.

The testimony of plaintiff's president on such trial could properly have been disregarded by the jury as that of an interested witness.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2439; Dec. Dig. ☞590.]

Action by the Harford National Bank of Bel Air against Squire B. Gardner.　On motion for a new trial and to set aside a verdict for defendant.　Motion for new trial denied.

Gibbs, Holmes, Waterman & Holmes and Alva Seybolt, all of Oneonta, for plaintiff.

A. L. Kellogg, of Oneonta, for defendant.

DAVIS, J.　This is an action to recover on a promissory note in the hands of the plaintiff, who claims to be a holder in due course. The defense was fraud and deceit in the inception of the note, which constituted an infirmity in the instrument with notice to the plaintiff. The verdict of the jury was for the defendant.

About March, 1911, the Proctor Slate Corporation purchased of the Proctor Slate Company, a corporation operating in slate quarries

in Cardiff, Md., its property, which consisted at the time of "about 67 acres of land, a $150,000 mortgage, and a lot of talk." The purchase price was $10,000 in cash, a mortgage to the seller for $290,000, and $100,000 in the capital stock of the new corporation. This latter figure may be $200,000, for the president of the company which sold the property could not remember, when called as a witness, minor details of that nature.

The Proctor Slate Corporation was organized to purchase this property and to sell its own stock according to the most modern methods of finance. It was capitalized at $2,500,000. It had a "fiscal agent." The first one was a man by the name of Feist, who operated under some corporate name. It was Feist's business to sell the stock of the Proctor Slate Corporation, and when unfortunately he went to prison in November, 1911 (on a charge not connected with the stock manipulation), he was succeeded as "fiscal agent" by Charles A. Hutton & Co., Incorporated. A representative of the Hutton Company sold stock to the defendant by means of representations found by the jury to be false and fraudulent. The defendant gave a note to Charles A. Hutton & Co., Incorporated, for $1,000 for this stock, which the jury found, with apparent good reason, was a part of a swindling transaction. The payee indorsed the note to the Proctor Slate Company, and the latter transferred it before maturity to the plaintiff, who claims to be a holder in due course, and has brought this action to recover thereon.

There is but one question presented for determination here, and that is whether plaintiff took this note "in good faith and for value," and with "no notice of any infirmity in the instrument or defect in the title of the person negotiating it." Section 91, Negotiable Instruments Law.

[1] We must assume that the jury found all controverted questions in favor of the defendant, and therefore the facts as proved must be considered in the light most unfavorable to the plaintiff. There is no direct proof of notice to the plaintiff of the fraudulent transactions engaged in in obtaining this note from the defendant. Therefore notice to the plaintiff and proof as to its bad faith must be proved by circumstances.

Williams, the president of the plaintiff bank, was also president of the Proctor Slate Company at the time its property was sold to the Proctor Slate Corporation. He lived only 18 miles from the quarry, and knew of the organization of the Proctor Slate Corporation, and how it was financed. He was the trustee of the mortgage given by the Proctor Slate Corporation as a part of the purchase price of the property. He was counsel for Howard Proctor, one of the parties who engaged in making the false representations to the defendant, and also counsel for the Proctor Slate Company.

The note was dated November 7, 1912, due four months after date. The maker was a man of no known financial responsibility, living in a small city in the state of New York 500 miles from the plaintiff's bank at Bel Air, Md. Williams knew that the Hutton Company was the fiscal agent of the Proctor Slate Corporation, and knew that it had no other business connection with it, or source of getting money

for it, except by the sale of stock. He knew, too, that the defendant had been down and looked over the property. On November 26, 1912, less than three weeks after the note was given, Williams stated that in September and for some time previous the Proctor Slate Corporation "was down and out, and broke, and behind in its payments on the purchase-money mortgage, and behind in its interest, and Hutton went out and sold stock for the company, and raised some money for them, and the proceeds were applied to the payment of debts of the company." On December 30, 1912, Williams, as trustee of the mortgage, discussed with Proctor and Hutton the financial condition of the Proctor Slate Corporation, and on January 2, 1913, Williams was appointed receiver of that company. On January 7th following he discounted the note in suit at his bank. Letters written by the defendant to Hutton and the Proctor Slate Corporation appeared on the trial in the hands of the plaintiff.

[2] Something more than suspicion is necessary to invalidate the title of a holder in due course. Oliner v. Goldenberg, 168 App. Div. 874, 154 N. Y. Supp. 612; American Exchange National Bank v. New York Belting, etc., Company, 148 N. Y. 698, 43 N. E. 168; Cole v. Harrison, 167 App. Div. 336, 153 N. Y. Supp. 200. But by the statute (Negotiable Instruments Law, § 95), to constitute notice of an infirmity in the instrument or defect in the title negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, *or knowledge of such facts that his action in taking the instrument amounted to bad faith.*

[3] Did Williams, the president of the plaintiff, have sufficient knowledge, as shown by the facts above stated, so that his action in taking the note amounted to bad faith? He must have known that this note, coming from the Hutton Company, was given for stock. They dealt in nothing else. He must have known, what is a matter of no serious dispute, that the Proctor Slate Corporation was a mere swindling concern. He knew at the very time that the note bears date that the Proctor Slate Corporation was financially insolvent and on its way to the receivership, which followed in less than two months, and he took for the bank the note of this stranger five days after he was appointed receiver. He had knowledge of all the main facts concerning the transactions of the Proctor Slate Corporation, except, perhaps, the particular representations made in obtaining this note. It is unbelievable that any honest representations could have been made which would have induced a responsible man to give his note for this stock. The character and value of the stock must have been known by Williams.

I think there was sufficient evidence from which the jury may properly have found that Williams, acting for the bank, had sufficient knowledge of the infirmity, so that his action in taking the note amounted to bad faith, although the proof is not direct, but must be drawn from the circumstances above stated.

[4] But there is another serious difficulty here that confronts the plaintiff in seeking to set aside this verdict. The statute provides that:

"When it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course." Section 98, Negotiable Instruments Law.

The only witness called on the subject of the purchase of the note was Williams himself. He says that the note came to him from the Proctor Slate Company, and that his attention was first called to it about the 15th of November, 1912. How it got into the hands of the Proctor Slate Company does not appear. Williams was, or had been, the president of the Proctor Slate Company. He says that he took it to the bank January 7, 1913, and had it discounted, and the proceeds placed to his own credit, and then transferred it to the Proctor Slate Company to pay the interest on their first mortgage bonds. The only corroboration of Williams' evidence was the production of a bank book purporting to have been issued by his bank, showing the entry. The accuracy of the book was vouched for by no one. He testified that he had no knowledge of the fraud; but on all these questions he was, as the president of the plaintiff bank, an interested witness. In Vosburgh v. Diefendorf, 119 N. Y. 357, 23 N. E. 801, 16 Am. St. Rep. 836, Judge O'Brien says:

"But in this state it must be regarded now as a settled rule that when the maker of a negotiable paper shows that it has been obtained from him by fraud or duress, a subsequent transferee must, before entitled to recover on it, show that he is a bona fide purchaser."

The jury could properly disregard the testimony of this witness as being interested, and say that he had not sustained the burden of proof required to convince them that in taking the note it was taken in good faith and for value and with no notice of any infirmity. National Bank of Barre v. Foley, 54 Misc. Rep. 126, 103 N. Y. Supp. 553.

The practice of banks of allowing themselves to be parties to swindling transactions of this nature is too common to admit of encouragement. Sharp, unscrupulous men are constantly engaged in obtaining from people of small or moderate means their savings by just such methods as have been described in the sale of the stock for which this note was given. If less facility is given to these men to discount their notes obtained under such circumstances, the public interest will not greatly suffer.

The motion for a new trial is denied. Ordered accordingly.